STATE OF CONNECTICUT *v.* ISSCHAR HOWARD
(AC 25251)

Foti, Dranginis and McDonald, Js.

Argued December 6, 2004—officially released April 12, 2005

*Robert W. Chesson*, with whom were *G. Adam Schweickert* and, on the brief, *Lauren Weisfeld*, assistant public defender, for the appellant (defendant).

*Timothy J. Sugrue*, senior assistant state's attorney, with whom, on the brief, were *Michael Dearington*, state's attorney, and *David J. Strollo*, senior assistant state's attorney, for the appellee (state).

MCDONALD, J. The defendant, Isschar Howard, appeals from the judgments of conviction, rendered following a jury trial, of capital felony in violation of General Statutes § 53a-54b (8), two counts of murder in violation of General Statutes § 53a-54a (a), criminal possession of a firearm in violation of General Statutes § 53a-217 (a), carrying a pistol or revolver without a permit in violation of General Statutes § 29-35 and possession of narcotics in violation of General Statutes § 21a-279 (a). On appeal, the defendant claims that the trial court improperly (1) instructed the jury on the element of intent as to the murder charges, (2) sanctioned a nonunanimous verdict, (3) granted the state's motion to consolidate the murder and drug cases against him, (4) denied his motion to suppress pretrial identifications, (5) admitted autopsy photographs into evidence and (6) instructed the jury on reasonable doubt. We disagree and affirm the judgments of the trial court.

The jury reasonably could have found the following facts. On the evening of January 23, 2000, Allen Williamson and Samuel Tate approached the defendant and the defendant's cousin, Tyrese Hundley, who were selling narcotics on the corner of Chapel Street and Winthrop Avenue in New Haven. Williamson and Tate confronted the defendant and Hundley, asking them about their activities on the street corner, and an argument ensued among the young men about which of them could sell drugs on that street corner. Williamson punched the defendant and a fight erupted. Hundley then gave the defendant a .40 caliber Smith and Wesson semiautomatic handgun, which he then pointed at Williamson, and the fighting stopped. Neither Tate nor Williamson were armed.

Williamson twice dared the defendant to shoot him, a challenge which he accepted by shooting at Williamson

three times. Williamson fell to the street, and the defendant returned to Tate and Hundley, who had been watching the events while grappling on the ground. At that point, Tate and Hundley no longer were fighting. Tate had been using Hundley as a shield, but at the defendant's bidding, let go of Hundley. Tate, on his side and with his hands up, begged the defendant not to shoot. Ignoring Tate's pleas, the defendant fired the gun three times at Tate, who still was lying on the ground.

After shooting Tate, the defendant and Hundley fled into the building at 300 Winthrop Avenue, leaving Tate curled in a fetal position, bleeding, choking on his blood and gasping for breath. Williamson remained on the ground, motionless, with his eyes rolled back. Williamson died in a hospital on January 26, 2000. The cause of death was a gunshot wound to the head with injuries to the brain. The bullet followed a straight path, entering Williamson's skull on the left side of his head, passing through his brain and exiting through the skull on the right side of the head. Tate was pronounced dead on January, 23, 2000. The cause of Tate's death was gunshot wounds to the chest and abdomen with injuries to his internal organs. The medical examiner found gunshot wounds caused by three bullets: one entered Tate's chest, and the other two entered his chest and pelvis. The medical examiner traced the bullet tracks for each gunshot, and they were consistent with Tate having been shot while lying down in a horizontal position. All three bullets caused massive injuries to Tate's internal organs.

Responding to multiple 911 calls from witnesses, officers and detectives of the New Haven police department arrived at the scene of the shootings. They located six spent .40 caliber Smith and Wesson shell casings at the scene and later recovered three bullets, two at the hospital and one after the medical examiner performed an autopsy on Tate.

The police discovered the defendant hiding in the bathroom of Tiffany Spahn's apartment at 300 Winthrop Avenue. The defendant agreed to accompany the police officers downtown to assist in the investigation. Before leaving the apartment, the defendant surrendered to the police some crack cocaine that he had in his pocket. The defendant was placed under arrest on a charge of possession of narcotics and led out of the building. After obtaining written consent from Spahn to search the apartment, the police found Hundley, who had been hiding in the kitchen pantry. The next day, after executing a search warrant at Spahn's apartment, the police found a silver and gray .40 caliber Smith and Wesson semiautomatic handgun and ammunition similar to the spent bullets recovered at the crime scene and from Tate's body. The state forensic science laboratory determined that the gun had been used to fire the bullets found at the scene. At the police department on the night of the shootings, the police advised the defendant of his rights pursuant to *Miranda* v. *Arizona*, 384 U.S. 436, 86 S. Ct. 1602, 16 L. Ed. 2d 694 (1966), after which he admitted to shooting Williamson and Tate.

Prior to trial, the state successfully moved to consolidate the information charging the defendant with the murders, capital felony and weapons offenses with the information charging him with possession of narcotics. After a jury trial, the defendant was found guilty of all six counts and sentenced to a total effective term of life in prison without the possibility of release, plus seventeen years imprisonment. Additional facts relevant to each of the defendant's claims will be provided as necessary.

I

The defendant first claims that the court improperly instructed the jury regarding the intent element of the

murder charges.[1] Specifically, the defendant claims that the court improperly instructed the jury that it could find that he intended to cause the victims' deaths even

[1] The court used the following relevant language in its instruction to the jury regarding that claim: "I will now go through these three elements [of General Statutes § 53a-54] with you and explain them to you in detail. In order for you to convict the defendant of murder, you must find that the state has proven beyond a reasonable doubt that, one, the defendant . . . intended to cause the death of Allen Williamson and Samuel Tate, and, two, acting with that specific intent, the defendant . . . caused the death of Allen Williamson and Samuel Tate, and, three, in the commission of the offense, he used a firearm. The state must prove each of these elements beyond a reasonable doubt.

"Now, let's talk about intent. As to the first element, the state must prove beyond a reasonable doubt that the defendant had the intent to cause the death of the victims, Allen Williamson and Samuel Tate. The state must prove beyond a reasonable doubt that the defendant, in causing the death of the victims, did so with the specific intent to cause death. In other words, the state must prove that the defendant's conscious objective was to cause the death of the victims. There is no particular length of time necessary for the defendant to have formed the specific intent to kill. Intent may be formed in seconds, actually in a brief instant, before the commission of the act. However, it is necessary for the intent to be formed prior to or during the act resulting in the commission of the crime.

"Intent relates to the condition of the mind of the person who commits the acts, his purpose in doing it. As defined by our statute, a person acts 'intentionally' with respect to a result when his conscious objective is to cause such result or to engage in such conduct. Intentional conduct is purposeful conduct rather than conduct that is accidental or inadvertent. Intent is a mindful process.

"What a person's purpose or intention has been is necessarily largely a matter to be determined by inference. A person's intent may be proven by direct or circumstantial evidence. No person can be expected to testify that he looked into another person's mind and therein saw a certain intent. However, the jury may determine what a person's intention was at a given time, aside from that person's own statements or testimony, by determining what the person's conduct was and what the circumstances were surrounding the conduct, and from these things infer what his intention was.

"The type and number of wounds inflicted, as well as the instrument used, may be considered as evidence of the perpetrator's intent, and from such evidence, an inference may be drawn in some cases that there was intent to cause a death. Any inference that may be drawn from the nature of the instrumentality used and the manner of its use is an inference of fact to be drawn by the jury upon consideration of these and other circumstances of the case in accordance with my previous instructions. Declarations and conduct of the accused before and after the infliction of wounds may be considered if you find they tend to show the defendant's intent."

if, as to causation, he did not intend his acts to cause the particular kind of harm that resulted. In light of our Supreme Court's decisions in *State* v. *Boles*, 223 Conn. 535, 613 A.2d 770 (1992), and *State* v. *Francis*, 228 Conn. 118, 635 A.2d 762 (1993), we disagree.

The defendant contends that he preserved his claim at trial by submitting a written request to charge. See Practice Book § 42-16. In the request to charge, the defendant addressed the intent element of murder but did not address causation. As we will set forth, the language challenged by the defendant appeared in the court's instruction on causation. Because the defendant's request to charge did not address the instruction claimed to be improper and because the defendant did not take exception to the language, his claim has not been preserved for appellate review. See Practice Book § 42-16. Although unpreserved, the defendant maintains that he can prevail on this claim under *State* v. *Golding*, 213 Conn. 233, 239–40, 567 A.2d 823 (1989), and the plain error doctrine.[2] See Practice Book § 60-5. We disagree.

"When reviewing [a] challenged jury instruction . . . we must adhere to the well settled rule that a charge to the jury is to be considered in its entirety, read as a whole, and judged by its total effect rather than by its individual component parts. . . . [T]he test of a court's charge is not whether it is as accurate upon

---

[2] To prevail on appeal on a constitutional claim that was not preserved adequately at trial, a defendant must meet all of the following conditions: "(1) the record is adequate to review the alleged claim of error; (2) the claim is of constitutional magnitude alleging the violation of a fundamental right; (3) the alleged constitutional violation clearly exists and clearly deprived the defendant of a fair trial; and (4) if subject to harmless error analysis, the state has failed to demonstrate harmlessness of the alleged constitutional violation beyond a reasonable doubt." *State* v. *Golding*, supra, 213 Conn. 239–40. "[W]e remain free to dispose of the claim by focusing on whichever condition is most relevant in the particular circumstances." (Internal quotation marks omitted.) *State* v. *Stanley*, 223 Conn. 674, 689, 613 A.2d 788 (1992).

legal principles as the opinions of a court of last resort but whether it fairly presents the case to the jury in such a way that injustice is not done to either party under the established rules of law. . . . As long as [the instructions] are correct in law, adapted to the issues and sufficient for the guidance of the jury . . . we will not view the instructions as improper." (Internal quotation marks omitted.) *State* v. *Ledbetter*, 263 Conn. 1, 21, 818 A.2d 1 (2003). "[I]t is well established that [a] charge to the jury is not to be critically dissected for the purpose of discovering possible inaccuracies of statement, but is to be considered rather as to its probable effect upon the jury in guiding [it] to a correct verdict in the case. . . . The charge is to be read as a whole and individual instructions are not to be judged in artificial isolation from the overall charge." (Internal quotation marks omitted.) *State* v. *Aponte*, 63 Conn. App. 82, 85, 774 A.2d 1035 (2001), aff'd, 259 Conn. 512, 790 A.2d 457 (2002).

The defendant challenges one sentence in the portion of the court's charge in which the jury was instructed as to causation. The defendant claims that the following language, almost identical to the language challenged in *Francis* and somewhat similar to that in *Boles*,[3] permitted the jury to reach a guilty verdict for the murder

[3] In *Francis*, the trial court used the following instruction as to causation: "*It is not necessary that the particular kind of harm that results from the defendant's acts be intended by him. Where the death or injury caused by the defendant's conduct is a foreseeable and natural result of that conduct, the law considers the chain of legal causation unbroken and holds the defendant criminally responsible.*" (Emphasis in original; internal quotation marks omitted.) *State* v. *Francis*, supra, 228 Conn. 131 n.11. In *Boles*, the trial court, as to causation, instructed the jury: "*It's not necessary that the particular kind of harm that results from the defendant's act be intended by him* or the death or injury caused by the defendant's conduct is a foreseeable and natural result of that conduct. The law considers the chain of legal causation unbroken and holds the defendant criminally responsible." (Emphasis added; internal quotation marks omitted.) *State* v. *Boles*, supra, 223 Conn. 541.

charges without finding that he had the specific intent to kill: "It does not matter whether this particular kind of harm that results from the defendant's act be intended by the defendant."[4] Although such language could mislead a jury were it used to explain the intent element of murder, the court used the language as part of its instruction as to causation. A lengthy and correct explanation of the intent requirement for murder preceded that particular sentence of the charge to the jury. See footnote 1. Furthermore, the court provided preliminary instructions regarding the elements of murder to each panel of prospective jurors before voir dire[5]

[4] In its entirety, the portion of the court's charge to the jury relating to the causation element of murder provided: "Causation. As to the second element, the state must prove beyond a reasonable doubt that the defendant, acting with the intent to cause the death of the victim, did in fact cause the death of the victim. This means that the state must prove that the death of Allen Williamson and Samuel Tate was caused by the actions of the defendant. The state must prove beyond a reasonable doubt that the defendant caused the death of the victims, Allen Williamson and Samuel Tate, with the intent to cause their death. This means that the defendant's conduct was the proximate cause of the victims' death. An act is a proximate cause of the victims' death when it substantially and materially contributes, in a natural and continuing sequence, unbroken by any intervening cause, to the victims' death. It is a cause without which the death would not have occurred, a predominating cause, a substantial factor, from which the death follows as a natural, direct and immediate consequence. *It does not matter whether this particular kind of harm that results from the defendant's act be intended by the defendant.* When the death caused by the defendant's conduct is a foreseeable and natural result of that conduct, the law considers the chain of legal causation unbroken and holds the defendant criminally responsible." (Emphasis added.).

[5] Before the voir dire of each panel of prospective jurors, the court read the information charging the defendant with two counts of murder, including the elements of the crime.

The court stated: "Second count, and the [prosecutor] further accuses [the defendant of] murder and charges [that] at the city of New Haven on or about the twenty-third day of January, 2000, at approximately 7:48 p.m., in the area of Winthrop Avenue and Chapel Street, the said [defendant] did, with intent to cause the death of another person, cause the death of such person or of a third person by the use of a firearm, said conduct being in violation of § 53a-54a (a) of the Connecticut General Statutes.

"Third count. The attorney aforesaid further accuses [the defendant of] murder and charges [that] at the city of New Haven on or about the twenty-

and to the empaneled jury prior to the start of evidence.[6] As our Supreme Court observed in *Boles*, "[i]n the context of the court's instructions concerning intent and causation, it would strain reason to believe that the jury could have heard the challenged instruction as eliminating the element of intent. We believe that construed reasonably in context the meaning conveyed was that obviously intended by the trial court; that is, that the jury, in order to convict the defendant of murder, had to find proven both that the defendant intended to cause the victim's death and that his conduct was, in fact, the proximate cause of her death." *State* v. *Boles*, supra, 223 Conn. 542. Our Supreme Court also has stated: "If the trial court has given a preliminary instruction on the element of intent, the subsequent use of the language challenged here cannot be viewed in isolation. The instruction neither eliminates the element of intent, nor substitutes causation therefor." *State* v. *Francis*, supra, 228 Conn. 130–31. As in *Boles* and *Francis*, when construed reasonably in the context of the entire jury charge, the challenged language did not eliminate the element of intent. Accordingly, we reject the defendant's claim. We conclude that there was no constitutional error under *Golding*. See *State* v. *Francis*, supra, 131; *State* v. *Boles*, supra, 543.

We also conclude that because the defendant suffered no manifest injustice, the claim does not warrant plain error review. See *State* v. *Boles*, supra, 223 Conn. 543. The evidence overwhelmingly supports a finding that

third day of January, 2000, at approximately 7:48 p.m., in the area of Winthrop Avenue and Chapel Street, the said [defendant] did, with intent to cause the death of another person, cause the death of such person or a third person by the use of a firearm, said conduct being in violation of § 53a-54a (a) of the Connecticut General Statutes."

[6] Before the start of evidence, the court again read the murder charges as described in the information, including the elements of the crime. The court used the exact language it used in its preliminary instructions before voir dire. See footnote 5.

the defendant had the specific intent to kill that was required to convict him of murder. The evidence indicates that the defendant fired a .40 caliber handgun six times at his victims, inflicting multiple gunshot wounds, which caused massive fatal injuries to both Williamson and Tate.

## II

The defendant claims that the court improperly sanctioned a nonunanimous verdict. He argues that the court's instruction regarding the capital felony offense allowed the jury impermissibly to reach a nonunanimous guilty verdict on the basis of any of three conceptually distinct alternatives: if it found that the murders occurred at the same time, during the same transaction or both.[7] The defendant contends that some jurors could

[7] The court gave the following relevant jury instruction to explain capital felony: "Let's talk about capital felony. The defendant is charged in the first count of the information with the crime of capital felony. This count of the information reads as follows: The senior assistant state's attorney for the judicial district of New Haven accuses [the defendant] of capital felony and charges [that] at the city of New Haven, on or about the twenty-third day of January, 2000, at approximately 7:48 p.m., in the area of Winthrop Avenue and Chapel Street, the said [defendant] murdered two persons at the same time or in the course of a single transaction in violation of § 53a-54b (8) of the Connecticut General Statutes.

"Now, § 53a-54b of the General Statutes defines the crimes of capital felony. There are a number of crimes described, but the relevant portion of the statute as it is applicable here reads as follows: 'A person is guilty of a capital felony who is convicted of murder of two persons at the same time or in the course of a single transaction.'

"It is the aggravating factor of the murder of two persons at the same time or in the course of a single transaction that makes capital felony a crime distinct from the underlying murders.

"For you to find the defendant . . . guilty of the crime of capital felony as charged in the first count of this information, you must find the following elements proven to your satisfaction beyond a reasonable doubt: first, that the defendant . . . was the actor. That is, the person involved in the alleged crime. Secondly, that the defendant . . . did murder Allen Williamson on or about the twenty-third day of January, 2000, at approximately 7:48 p.m. in the area of Winthrop Avenue and Chapel Street. Thirdly, that the defendant . . . did murder Samuel Tate on or about the twenty-third day of January, 2000, at approximately 7:48 p.m. in the area of Winthrop Avenue and Chapel Street, and, fourth, that the defendant . . . did murder Allen Williamson and Samuel Tate at the same time or in the course of a single transaction.

find guilt beyond a reasonable doubt as to one alterna-

"If you find that the state has established each and every one of these elements to your satisfaction beyond a reasonable doubt, you should return a verdict of guilty of the crime of capital felony as charged in this count of the information.

"If you find that the state has failed to prove any one or more of these elements beyond a reasonable doubt or if, after considering all of the evidence, you have a reasonable doubt of the guilt of the defendant, then you must return a verdict of not guilty of the crime of capital felony as charged in the first count of this information.

"Now, since the state must establish beyond a reasonable doubt that the defendant did murder Allen Williamson and did also murder Samuel Tate, you would not give consideration to this count unless you find that the state has proven both of the crimes of murder as alleged in the second and third counts. If you find those not proven, then you must return a verdict of not guilty here.

"If you have [found] proven to your satisfaction beyond a reasonable doubt that the defendant . . . was the shooter involved in both killings, and if you have found proven beyond a reasonable doubt that the defendant did murder, as I have described that crime to you, both Allen Williamson and Samuel Tate, then you should consider whether the state has proven to your satisfaction beyond a reasonable doubt, the final element of the crime of capital felony as charged in the first count.

"That is, that the defendant murdered both Allen Williamson and Samuel Tate, *either at the same time or in the course of a single transaction or both*. At the same time, [this] does not mean at the very same instance. As, for example, that the same gunshot or gunshots caused both deaths simultaneously. But rather, it means occurring together at approximately or substantially at the same time, although one after the other.

"In the course of a single transaction—that the two murders must have been established to have been done without interruption for other conduct or other activity not related to the killings. In other words, a single transaction is a series of related but separate events with a clear connection. A clear connection may be established by either proof beyond a reasonable doubt that the murders occurred within a brief interval or proof beyond a reasonable doubt that the defendant possessed a plan, motive or intent common to the murders.

"Thus, in order to find that the murders occurred at the same time or in the course of a single transaction, you must find beyond a reasonable doubt that any one of the following is true: one, the murders occurred at the same time or, two, the murders occurred within a brief interval of time or, three, that the defendant possessed a plan, motive or intent common to the murders.

"To summarize, before the defendant can be found guilty of the crime of capital felony as charged in the first count of the information, the state must prove to your satisfaction beyond a reasonable doubt, each and every

tive, and other jurors could find guilt beyond a reasonable doubt as to another clearly distinct alternative, resulting in a guilty verdict reached on nonunanimous grounds. The defendant claims that the court's instruction sanctioned this nonunanimous guilty verdict and deprived him of a fair trial. We disagree.

The defendant concedes that his claim was not raised at trial and seeks review in accordance with *State* v. *Golding*, supra, 213 Conn. 239–40.[8] Even though the claim is unpreserved, we reach its merits because "[a] claim bearing on the defendant's right to a unanimous verdict implicates a fundamental constitutional right to a fair trial and is thus reviewable despite the defendant's failure to request a specific unanimity charge or take proper exceptions." *State* v. *Famiglietti*, 219 Conn. 605, 619, 595 A.2d 306 (1991).

one of the following elements: first, that the defendant . . . was the person involved. That is, he was the shooter. Secondly, that the defendant . . . murdered Allen Williamson. That is, acting with the intent to cause the death of Allen Williamson, he did cause the death of Allen Williamson as alleged in the second count. Thirdly, that the defendant . . . also murdered Samuel Tate. That is, acting with the intent to cause the death of Samuel Tate, he did cause the death of Samuel Tate as alleged in the third count. Fourth, he murdered both Allen Williamson and Samuel Tate at the same time as I have explained that term to you or in the course of a single transaction, as I have explained that term to you, or that he murdered both Allen Williamson and Samuel Tate at the same time and in the course of a single transaction.

"Only if you find all of these elements proven to your satisfaction beyond a reasonable doubt may you return a verdict of guilty of capital felony as charged in the first count.

"Again, with this count as with all the others, if the state has failed to prove one or more of these elements to your satisfaction beyond a reasonable doubt, or if after considering all of the credible evidence you have a reasonable doubt of the guilt of the defendant, you must return a verdict of not guilty of the crime of capital felony as charged in the first count of the information." (Emphasis added.)

[8] Footnote 2 sets forth the four *Golding* conditions a defendant must meet in order to prevail on appeal on a constitutional claim that was not preserved adequately at trial.

We have set forth in part I the standard of review for challenges to jury instructions. See *State* v. *Ledbetter*, supra, 263 Conn. 21; *State* v. *Aponte*, supra, 63 Conn. App. 85. As to that issue, our Supreme Court has stated: "We have . . . invoked a multipartite test to review a trial court's omission of [a specific unanimity] instruction. We first review the instruction that was given to determine whether the trial court has sanctioned a nonunanimous verdict. If such an instruction has not been given, that ends the matter." *State* v. *Famiglietti*, supra, 219 Conn. 619.

Turning to the instruction given to the jury in this case, the court directed the jury that it must find "that the defendant murdered both Allen Williamson and Samuel Tate, either at the same time or in the course of a single transaction or both." Soon after that portion of the instruction, the court also charged the jury that it "must find beyond a reasonable doubt that *any one of the following* is true: one, the murders occurred at the same time or, two, the murders occurred within a brief interval of time or, three, that the defendant possessed a plan, motive or intent common to the murders." (Emphasis added.) The court further instructed the jurors, toward the end of the charge, that when they "reach a verdict, it must be unanimous. That is, one with which you all agree." The court instructed the jury that it could return only a unanimous verdict, one with which all members of the panel agreed. The court had instructed the jury that to find the defendant guilty of capital felony, it must find beyond a reasonable doubt that he committed the murders in a manner that satisfied *one* of three requirements. Because a jury is presumed to follow the law as instructed by the court; *State* v. *Dahlgren*, 200 Conn. 586, 603, 512 A.2d 906 (1986); the court did not sanction a nonunanimous verdict. We conclude that in following the court's instructions, the jury unanimously found *one* of the

requirements proven beyond a reasonable doubt and did not return a nonunanimous verdict. As we conclude that the instruction did not sanction a nonunanimous verdict, our review of the defendant's claim ends. See *State* v. *Famiglietti*, supra, 219 Conn. 619.

### III

The defendant claims that the court improperly granted the state's motion to join for trial the information charging him with the murders, capital felony and the weapons offenses with the information charging him with possession of narcotics. The defendant contends that the joinder of the two cases permitted the jury to consider highly prejudicial evidence. He claims that the jury, even though instructed by the court to treat the cases separately, could not ignore the cumulative effect of the evidence when considering separately each crime with which the state charged the defendant. We disagree.

The following additional facts are relevant to our resolution of the defendant's claim. Prior to trial, the court granted the state's motion to consolidate the two informations, one concerning the murders and the other the narcotics charge. In granting the state's motion, the court found that joinder of the two informations would not substantially prejudice the defendant, that the charges in the two informations were factually dissimilar but legally connected, that the facts of each case were simple and distinct, that the trial would be short, that the charges in the two informations were not so brutal or shocking as to preclude joinder and that consolidation is favored as a matter of policy.

We first set forth our standard of review of the defendant's claim. "General Statutes § 54-57 and Practice Book § 829 [now § 41-19] authorize a trial court to order a defendant to be tried jointly on charges arising separately. In deciding whether to sever informations joined

for trial, the trial court enjoys broad discretion, which, in the absence of manifest abuse, an appellate court may not disturb. . . . The defendant bears a heavy burden of showing that the denial of severance resulted in substantial injustice, and that any resulting prejudice was beyond the curative power of the court's instructions." (Citations omitted; internal quotation marks omitted.) *State* v. *Herring*, 210 Conn. 78, 94–95, 554 A.2d 686, cert. denied, 492 U.S. 912, 109 S. Ct. 3230, 106 L. Ed. 2d 579 (1989).

In *State* v. *Boscarino*, 204 Conn. 714, 529 A.2d 1260 (1987), our Supreme Court "discussed several factors that a trial court should consider in making its determination whether severance is required in order to avoid the omnipresent risk . . . that although so much [of the evidence] as would be admissible upon any one of the charges might not [persuade the jury] of the accused's guilt, the sum of it will convince them as to all. . . . These factors include: (1) whether the charges involved discrete, easily distinguishable factual scenarios; (2) whether the crimes were of a violent nature or concerned brutal or shocking conduct on the defendant's part; and (3) the duration and complexity of the trial. . . . [I]f any or all of these factors were present, a reviewing court would have to decide whether the trial court's jury instructions cured any prejudice that might have occurred." (Citations omitted; internal quotation marks omitted.) *State* v. *Herring*, supra, 210 Conn. 95.

In its decision, the court properly considered the *Boscarino* factors when it granted the state's motion to consolidate the two informations in this case. We conclude that the two informations involved distinct, distinguishable factual scenarios, that the trial would be short and that the joinder of the narcotics charge to the murder and weapons charges would not prevent the jury from considering those charges fairly. Although

the murders might be considered brutal and shocking, we agree with the court that the narcotics charge did not create evidence of such brutal and shocking conduct as to impair the jury's ability to consider fairly the charges in the informations. See *State* v. *Boscarino*, supra, 204 Conn. 723. Furthermore, the defendant's possession of narcotics at the time was some evidence of the motive for the shootings, a dispute over sales territory for drugs. Thus, a legal connection exists between the charges contained in each information. See id., 722. Moreover, the court instructed the jury that "each offense charged must be considered separately by you in deciding the guilt of the defendant. If you conclude the defendant is guilty of one particular count in one information, you cannot then conclude that because he is guilty of one count, then there must be culpability in the remaining counts. That would be a violation of your duties and obligations as jurors." "In the absence of a clear indication to the contrary, we presume that the jury followed the court's instructions . . . ." *State* v. *Peeler*, 267 Conn. 611, 638, 841 A.2d 181 (2004). We find that the court did not abuse its discretion by granting the state's motion to consolidate the two informations. We conclude that the defendant has not demonstrated that the denial of severance resulted in substantial injustice, nor has he shown that any resulting prejudice was beyond the curative power of the court's instructions. See *State* v. *Herring*, supra, 210 Conn. 95.

## IV

The defendant claims that the court improperly denied his motion to suppress two separate identifications of him that were made by an eyewitness to the shootings. The defendant claims that the court's refusal to suppress the pretrial identifications made by Dennis Robinson violated the due process guarantees of the fourteenth amendment to the United States constitu-

tion. We disagree with the defendant's arguments and find that the court properly denied his motion to suppress the identifications.

"Our standard of review in connection with a court's denial of a motion to suppress a pretrial identification is well settled. Upon review of a trial court's denial of a motion to suppress, [t]he court's conclusions will not be disturbed unless they are legally and logically inconsistent with the facts. . . . [W]e will reverse the trial court's ruling [on evidence] only where there is abuse of discretion or where an injustice has occurred . . . and we will indulge in every reasonable presumption in favor of the trial court's ruling. . . . Because the issue of the reliability of an identification involves the constitutional rights of an accused . . . we are obliged to examine the record scrupulously to determine whether the facts found are adequately supported by the evidence and whether the court's ultimate inference of reliability was reasonable." (Internal quotation marks omitted.) *State* v. *Elliston*, 86 Conn. App. 479, 482–83, 861 A.2d 563 (2004), cert. denied, 273 Conn. 906, 868 A.2d 746 (2005).

Before the presentation of evidence, the court held a hearing concerning the defendant's motion to suppress the identifications made by Robinson and found the following facts. Robinson witnessed the shootings while smoking and leaning out of the window of his fifth floor apartment at 1523 Chapel Street. Robinson testified that the shooter wore a black leather jacket and that the companion, the one who gave the shooter the gun, wore a white and blue windbreaker. He recognized both individuals as residents of 300 Winthrop Avenue, the building across the street. After the victims were shot, Robinson watched the gunman and his friend run into the building at 300 Winthrop Avenue. He then shouted to his girlfriend's mother to call the police. Robinson remained at the window, watching as people

gathered to assist the victims and police cruisers arrived at the scene.

Approximately one hour later, Robinson, still watching from his apartment window, observed police officers escort the defendant out of 300 Winthrop Avenue and into a squad car. He again asked his girlfriend's mother to telephone the police because the man he had just seen escorted out of the building was the man who shot the victims. A New Haven police detective arrived at Robinson's apartment shortly thereafter and radioed to the officers on the scene that he was with an eyewitness to the shootings. The officers then took the defendant out of the squad car, brought him to the steps of 300 Winthrop Avenue and positioned him so that he faced across the street in the direction of Robinson's building. The detective in Robinson's apartment turned off the lights and brought Robinson back to the window, where he immediately identified the defendant, although now dressed differently, as the man in the black leather jacket who had shot the two victims.

The defendant claims that the first identification made by Robinson was the product of an impermissible show-up procedure. He claims that the police used an identification procedure so impermissibly suggestive as to give rise to a substantial likelihood of an irreparable misidentification. See *State* v. *Garner*, 270 Conn. 458, 468–69, 853 A.2d 478 (2004). "[I]t is well established that conduct that may fairly be characterized as state action is a necessary predicate to a challenge under the due process clause . . . . If an identification of a defendant is done spontaneously and is not arranged by the police, the identification is not tainted by state action and due process rights are not violated." (Citation omitted; internal quotation marks omitted.) *State* v. *Jones*, 59 Conn. App. 762, 766, 757 A.2d 689 (2000), cert. denied, 255 Conn. 924, 767 A.2d 99 (2001). The court properly found that there was no impermissible

state action involved in the first identification of the defendant made by Robinson. Robinson identified the defendant spontaneously, not as the result of some suggestive procedure employed by the police. The defendant claims the court overlooked his detention by the police, the decision to handcuff him and his transferal into and out of the police car, arguing that that was state action on which he can predicate a challenge under the due process clause. We conclude that none of that state action amounted to official procedures subject to the strictures of due process. See *State* v. *Nims*, 8 Conn. App. 631, 637, 513 A.2d 1280, cert. denied, 201 Conn. 812, 516 A.2d 887 (1986). No law enforcement official directed Robinson to identify the defendant as the police escorted him out of 300 Winthrop Avenue. This first identification was not prearranged or in any way contrived by the police or the prosecution. See id. Because the defendant has failed to show that the initial identification was the product of an unconstitutional state procedure, the court properly denied his motion to suppress Robinson's first identification. See *State* v. *Pollitt*, 205 Conn. 132, 162–64, 531 A.2d 125 (1987).

To address the defendant's claim that the court improperly denied his motion to suppress Robinson's second identification, we use a two-pronged, ad hoc analysis. "[F]irst, it must be determined whether the identification procedure was unnecessarily suggestive; and second, if it is found to have been so, it must be determined whether the identification was nevertheless reliable based on an examination of the totality of the circumstances. . . . An identification procedure is unnecessarily suggestive only if it gives rise to a very substantial likelihood of irreparable misidentification." (Internal quotation marks omitted.) *State* v. *Garner*, supra, 270 Conn. 468–69. "Generally, [t]he exclusion of evidence from the jury is . . . a drastic sanction, one that is limited to identification testimony which is mani-

festly suspect." (Internal quotation marks omitted.) *State* v. *Wooten,* 227 Conn. 677, 685–86, 631 A.2d 271 (1993).

Our Supreme Court has recognized "that almost any one-to-one confrontation between a [witness to] a crime and a person whom the police present as a suspect is presumptively suggestive, but not all suggestive confrontations are unnecessary. . . . An immediate viewing of the suspect may be justified where it [is] important for the police to separate the prime suspect gold from the suspicious glitter, so as to enable them . . . to continue their investigation with a minimum of delay. . . . Circumstances may also justify an immediate viewing because prompt on-the-scene confrontations are generally more reliable and allow an innocent party to be released quickly if no positive identification is made." (Citations omitted; internal quotation marks omitted.) *State* v. *Collette,* 199 Conn. 308, 310–11, 507 A.2d 99 (1986). The exigencies of a situation can justify the use of a suggestive identification procedure. *State* v. *Wooten,* supra, 227 Conn. 686–87. Factors to consider when faced with the question of whether an exigency existed are "whether the defendant was in custody, the availability of the [witness], the practicality of alternate procedures and the need of police to determine quickly if they are on the wrong trail." *State* v. *Holliman,* 214 Conn. 38, 48, 570 A.2d 680 (1990).

The procedures used during the second identification of the defendant, although suggestive, were not unnecessarily so due to the exigencies of the situation. The shootings occurred outside two large apartment buildings, and the apprehension of the suspect would prevent his escape and ensure the safety of the residents. The procedures used provided the police with the identification of the shooter by a witness, information vital to the speedy investigation of the shootings.

Moreover, the totality of the circumstances were such that the second identification was reliable. "To determine whether an identification that resulted from an unnecessarily suggestive procedure is reliable, [the court] must weigh the corrupting effect of the suggestive procedure in light of certain factors such as the opportunity of the witness to view the criminal at the time of the crime, the witness' degree of attention, the accuracy of [that person's] prior description of the criminal, the level of certainty demonstrated at the confrontation, and the time between the crime and the confrontation . . . ." (Citations omitted; internal quotation marks omitted.) *State* v. *Figueroa*, 235 Conn. 145, 157, 665 A.2d 63 (1995). Robinson had a clear, unobstructed view of the entire incident. He was familiar with the street corner because he frequently smoked while leaning out of the window from which he viewed the shootings. Not once did he leave the window while the crime was taking place. Robinson instructed his girlfriend's mother to call the police when he first saw the defendant in police custody. He accurately indicated the clothing the defendant wore when he shot the two victims and the fact that he had on different clothing when escorted from 300 Winthrop Avenue. Robinson also immediately identified the defendant when the police positioned him for the second identification. Robinson identified the defendant on the same evening that the crimes were committed and at the same location where they were committed. We conclude that the second identification of the defendant was not so suggestive as to present the substantial likelihood of irreparable misidentification. Even if the procedures employed for the second identification were unnecessarily suggestive, the identification was reliable under the totality of the circumstances. See *State* v. *Garner*, supra, 270 Conn. 470; *State* v. *Wooten*, supra, 227 Conn. 685. We reject the defendant's claim and conclude that

the court properly denied the defendant's motion to suppress the two pretrial identifications made by Robinson.

## V

The defendant claims the court improperly admitted into evidence sixteen autopsy photographs of the victims. Specifically, the defendant claims that the photographs were irrelevant and that their potential prejudicial effect outweighed any probative value they may have had. We disagree.

"The principles governing the admission of potentially inflammatory photographic evidence are clear. . . . [W]e adhere to the general rule that photographs which have a reasonable tendency to prove or disprove a material fact in issue or shed some light upon some material inquiry are not rendered inadmissible simply because they may be characterized as gruesome. . . . When, however, an initial determination is made by the trial court that such photographs may have the tendency to prejudice or inflame the jury, the admissibility of such evidence is dependent upon the trial court's determination as to whether their value as evidence outweighs their possible prejudicial effect. . . . Since the trial court exercises its broad discretion in such circumstances, its determination will not be disturbed on appeal unless a clear abuse of that discretion is shown." (Internal quotation marks omitted.) *State* v. *Walker*, 206 Conn. 300, 314–15, 537 A.2d 1021 (1988).

The defendant contends that the autopsy photographs were gruesome and inflamed the jury's passions enough to outweigh any of their probative value. The court's decision to admit the photographs into evidence, however, did not amount to a clear abuse of discretion. Potentially inflammatory photographs may be admitted into evidence if the court, in its discretion, determines that the probative value of the photographs outweighs

any potential prejudice. *State* v. *Ferraiuolo*, 80 Conn. App. 521, 527, 835 A.2d 1041 (2003), cert. denied, 267 Conn. 916, 841 A.2d 220 (2004). "[E]ven photographs depicting gruesome scenes that may prejudice the jury are admissible, so long as, in the court's discretion, they are more probative than prejudicial." (Internal quotation marks omitted.) Id., 530. Autopsy photographs depicting the wounds of victims are independently relevant because they may show the character, location and course of the bullets. *State* v. *Haskins*, 188 Conn. 432, 453, 450 A.2d 828 (1982). In this case, the state presented the photographs to prove intent and causation, to help explain the autopsy procedure, to assist the medical examiner in describing his observations and to corroborate the descriptions of the shootings by other witnesses who testified. The state made no other use of the photographs, and the court cautioned the jury, prior to the publication of the photographs, that their only purpose was to show the wounds sustained by the victims, not to arouse the jury's emotions. The court's decision to admit the challenged photographs into evidence was not an abuse of its discretion. Accordingly, we reject the defendant's claim.

VI

Finally, the defendant claims that the court improperly instructed the jury with respect to reasonable doubt.[9] He claims that the allegedly deficient reasonable

---

[9] The court provided the jury with the following instructions on reasonable doubt: "Let's talk about reasonable doubt. The meaning of reasonable doubt can be arrived at by emphasizing the word 'reasonable.' It is not a surmise, a guess or mere conjecture. It is not a doubt suggested by counsel which is not warranted by the evidence. It is such a doubt as, in serious affairs that concern you, you would heed. That is, such doubt as would cause reasonable men and women to hesitate to act upon it in matters of importance. It is not hesitation springing from any feelings of pity or sympathy for the accused or any other person who might be affected by your decision. It is, in other words, a real doubt, an honest doubt, a doubt that has its foundation in the evidence or lack of evidence. It is a doubt that is honestly entertained and is reasonable in light of the evidence after a fair comparison and careful examination of the entire evidence.

doubt instruction violated his rights under the United States constitution. The defendant concedes that his claim was not preserved and seeks review under *State* v. *Golding*, supra, 213 Conn. 239–40. We will review the defendant's claim because the record is adequate for review, and a claim of instructional error regarding the burden of proof is of constitutional magnitude. See *State* v. *Morant*, 242 Conn. 666, 686–87, 701 A.2d 1 (1997) (jury instruction on concept of reasonable doubt is fundamental constitutional right).

We note that the same instructions have been upheld previously by our Supreme Court and this court in the context of the entire jury charge. See, e.g., *State* v. *Betances*, 265 Conn. 493, 510–11, 828 A.2d 1248 (2003); *State* v. *Reynolds*, 264 Conn. 1, 102–103, 836 A.2d 224 (2003), cert. denied, 541 U.S. 908, 124 S. Ct. 1614, 158 L. Ed. 2d 254 (2004); *State* v. *Walsh*, 67 Conn. App. 776, 797, 789 A.2d 1031, cert. denied, 260 Conn. 906, 795 A.2d 546 (2002). We conclude that there was no constitutional violation; see *State* v. *Betances*, supra, 509; and because the defendant has failed to distinguish the instructions in this case from those previously upheld, we reject his final claim.

The judgments are affirmed.

In this opinion the other judges concurred.

---

"Proof beyond a reasonable doubt does not mean proof beyond all doubt. The law does not require absolute certainty on the part of the jury before it returns a verdict of guilty. The law requires that after hearing all the evidence, if there is something in the evidence or lack of evidence that leaves in the minds of the jurors, as reasonable men and women, a reasonable doubt as to the guilt of the accused, then the accused must be given the benefit of that doubt and acquitted. Proof beyond a reasonable doubt is proof that precludes every reasonable hypothesis except guilt and is inconsistent with any other rational conclusion."